# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 98-CA-00417-COA

**NEW BELLUM HOMES, INC.**                                           **APPELLANT**

**v.**

**KEITH AND BILLIE JEAN GIFFIN**                                     **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/10/1998 |
| TRIAL JUDGE: | HON. ROBERT LOUIS GOZA JR. |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | W. E. GORE JR. |
| | PAUL E. ROGERS |
| ATTORNEY FOR APPELLEES: | VERNON H. CHADWICK |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | JUDGMENT FOR HOME BUILDER MINUS MULTIPLE DEDUCTIONS FOR FAULTY WORK |
| DISPOSITION: | AFFIRMED IN PART, REVERSED AND RENDERED IN PART AND REVERSED AND REMANDED IN PART - 04/11/00 |
| MOTION FOR REHEARING FILED: | 5/17/2000; denied 8/1/2000 |
| CERTIORARI FILED: | 8/8/2000; denied as to New Bellum & granted as to Giffins 10/26/2000 |
| MANDATE ISSUED: | |

EN BANC

IRVING, J., FOR THE COURT:

¶1. On August 21, 1994, New Bellum Homes, Inc. executed a written contract with Keith and Billie Jean Giffin for the construction of a home on the reservoir in Rankin County, Mississippi, at an agreed price of $309,000. On December 18, 1995, New Bellum filed a complaint against the Giffins claiming $92,305 in actual damages for breach of contract, $100,000 in damages for impairment to its credit rating as a result of the Giffins' wrongful withholding of funds from the last contractual draw, and $500,000 in punitive damages, prejudgment interest and attorney's fees.

¶2. The Giffins filed a counterclaim charging New Bellum with numerous instances of breach of contract and negligence, and seeking actual, itemized damages in the amount of $73,075, punitive damages in the amount of $500,000, plus interest on their permanent construction loan for delay in completion of the contract, prejudgment interest and attorney's fees.

¶3. A bench trial was held by agreement of the parties. The trial judge found that a balance of $60,850 was

owed under the contract and that the Giffins were liable to New Bellum in the amount of $29,658.70 for cost overruns, changes and extras, for a total of $90,508.70. The judge also found that New Bellum was liable to the Giffins for credits in the amount of $10,384, claims in the amount of $36,647.45, compensation for defective mortar joints and other brick problems in the amount of $22,500 and interest paid on the construction loan in the amount of $4,938.08, for a total setoff of $74,469.53. Final judgment in the amount of $16,039.17 was entered for New Bellum against the Giffins. Feeling aggrieved, New Bellum filed this appeal, assigning the following issues, taken verbatim from its brief, as error:

**1. WHETHER OR NOT A TRIAL JUDGE ERRED IN DEDUCTING $22,500.00 FROM THE AMOUNT OWED BY GiffinS TO THE APPELLANT UNDER THE CONSTRUCTION CONTRACT FOR ALLEGED FAULTY BRICK WORK WHEN HE HAD NO EVIDENCE IN THE RECORD BY ANY EXPERT WITNESS.**

**2. WHETHER OR NOT THE TRIAL COURT ERRED IN DEDUCTING $12,895.00 FROM THE AMOUNT OWED BY THE GiffinS TO APPELLANT FOR INSTALLATION OF A NEW FRENCH DRAIN WHEN THE APPELLEES HIRED BOB'S POOL SERVICE TO INSTALL THE POOL AND IT DESTROYED THE DRAIN INSTALLED BY APPELLANT.**

**3. WHETHER OR NOT THE COURT WAS JUSTIFIED CHARGING THE PLAINTIFF/APPELLANT $1,000 FOR A SECOND STORY WINDOW WHICH WAS CHANGED BY APPELLANT AND ADMITTED THAT HE WAS NOT ENTITLED TO A CREDIT.**

**4. WHETHER OR NOT THE COURT ERRED IN DEDUCTING $2,088.64 FOR REPAIRS TO THE KITCHEN/BEDROOM AREA.**

**5. WHETHER OR NOT THE COURT ERRED IN DEDUCTING $3,153.29 FROM APPELLANT'S CLAIM UNDER THE CONTRACT FOR THE INSTALLATION OF A MEMBRANE ON THE FRONT PORCH.**

**6. WHETHER OR NOT THE COURT ERRED IN CHARGING APPELLANT WITH $1,105.00 FOR RE-CAULKING THE GARAGE AREA.**

**7. WHETHER OR NOT THE COURT ERRED IN CHARGING APPELLANT $1,512.22 FROM THE CONTRACT PRICE FOR FACIAL BOARD REPAIR.**

**8. WHETHER OR NOT THE COURT ERRED IN CHARGING APPELLANT $800.00 FOR CLEAN UP EXPENSES.**

**9. WHETHER OR NOT THE COURT ERRED IN CHARGING APPELLANT $650.00 TO REPLACE A MISSING PIER AND BEAM.**

**10. WHETHER OR NOT THE COURT ERRED IN CHARGING APPELLANT $3,000.00 TO REPAIR ALLEGED INTERIOR DAMAGES AROUND THE MISSING PIER.**

**11. WHETHER OR NOT THE COURT ERRED IN CHARGING APPELLANT $3,933.62 TO FINISH FLOORS AND BASEBOARDS.**

**12. WHETHER OR NOT THE COURT ERRED IN DEDUCTING $300.00 TO REPAIR A CRACK IN THE BRICKS OVER THE TRIPLED-UP RAFTER ABOVE THE GARAGE.**

**13. WHETHER OR NOT THE COURT ERRED IN CHARGING APPELLANT WITH $350.00 TO CLOSE THE CEILING AROUND THE CHIMNEY.**

**14. WHETHER OR NOT THE COURT ERRED IN DEDUCTING $5,405.64 FOR ROOF INSTALLATION AND REPAIRS OVER THE ARBOR FROM THE CONTRACT PRICE BALANCE, WHEN NO ROOF WAS REQUIRED UNDER THE CONTRACT.**

**15. WHETHER OR NOT THE COURT ERRED IN HOLDING APPELLANT LIABLE TO THE APPELLEES FOR INTEREST PAID ON A CONSTRUCTION LOAN FROM JULY 13, 1995, TO NOVEMBER 1, 1995, IN THE AMOUNT OF $4,938.08, WHEN THE DELAY` WAS DUE TO ADVERSE WEATHER CONDITIONS AND OTHER CAUSES, NOT THE FAULT OF THE APPELLANT.**

**16. WHETHER OR NOT THE COURT ERRED IN DENYING PLAINTIFF'S CLAIM FOR CHANGERS IN THE FOUNDATION FOOTING OF $10,527.00, ORDERED BY APPELLEE.**

**17. WHETHER THE COURT ERRED IN REFUSING TO ALLOW APPELLANT'S CLAIM OF $7,190.00 ADDITIONAL CHARGE FOR SITE PREPARATION.**

**18. WHETHER THE COURT ERRED IN DENYING THE APPELLANT'S REQUEST FOR PREJUDGMENT INTEREST ON $95,429.37 FROM NOVEMBER 1, 1995.**

Finding merit in some of New Bellum's issues, we affirm in part, reverse and render in part and reverse and remand in part. The facts necessary for the resolution of the issues will be set forth as needed under the discussion of each issue.

## ANALYSIS OF ISSUES PRESENTED

### *Standard of Review*

¶4. The findings of a trial judge sitting without a jury will only be reversed where the findings of the trial judge are manifestly erroneous or clearly wrong. *Amerson v. State*, 648 So. 2d 58, 60 (Miss.1994).

### *Issue one: Deduction for faulty brick work*

¶5. The trial court found that the Giffins were entitled to compensation for defective mortar joints and other brick problems in the amount of $22,500. New Bellum claims that there was no reliable or empirical evidence upon which to base this finding. It challenges the credibility of Don Walker, a home inspector engaged by the Giffins and qualified as an expert by the trial court, as well as the credibility of M. Dwaine Dunaway, a brick and mortar contractor of more than twenty years experience.

¶6. Dunaway testified that he went to the Giffins' home and ran water tests on several areas of the mortar, checking for water leaks. The results of the tests and visual inspection of the brick work led him to conclude that due to the number of mortar joint deficiencies it was necessary to repoint the building by grinding out the joint base and putting in new mortar. He gave the Giffins a written report stating that his charge for

performing the service would be $58,428.

¶7. Don Walker was hired by the Giffins to conduct an inspection of the home and make recommendations regarding any needed repairs and cost estimates. In his written report to the Giffins, he made note of a bulge in the brick wall on the west side of the house and gave an estimated repair cost that ranged from $2,000 to $12,000. At trial Walker testified that when he conducts an inspection and makes recommendations, he tries to offer more than one approach to solving a problem. He testified that his recommendation for a solution to the bulge problem was in keeping with this practice. He stated that he could see the possibility of having to take the wall down in the future; therefore, he used the $12,000 total replacement cost. The $2,000 estimate represented the cost for having work done to point up and reinforce the wall.

¶8. As stated previously, the court awarded the Giffins a total of $22,500 for correction of the faulty brick work. New Bellum argues that the trial court relied upon and was unduly influenced by what it characterized as "false, incorrect, and totally outlandish cost estimates," in making this award. It claims that Walker "clearly was a non-credible witness who provided unreliable information to the Court."

¶9. The trial judge has sole authority to determine the credibility of a witness when sitting as the trier of fact in a bench trial. *Rice Researchers, Inc. v. Hiter*, 512 So. 2d 1259, 1265 (Miss.1987). The question for this Court is whether the trial judge was manifestly in error or clearly wrong in rendering this award. We believe that he was.

¶10. While New Bellum complains vociferously in its brief about Walker's testimony being unreliable and an insufficient anchor for the trial court's findings, we do not find the trial judge's findings to be as problematic as we find his application of the law to those findings. Neither Walker nor Dunaway gave testimony supporting the $22,500 figure as an appropriate damage award. Dunaway's proposal and accompanying figure of $58,428 was for repointing all of the mortar joints and waterproofing all of the brick work. Walker did not find fault with all of the brick work. His recommendation was aimed at correcting the bulging wall. He gave two price estimates to accomplish this, one based on repairing only the faulty mortar joints and the other on replacing the entire wall, and as stated, those estimates were $2,000 and $12,000, respectively. Dunaway, on the other hand, testified that due to the number of mortar joint deficiencies, he felt it was necessary to repoint the entire building, and as stated, his price estimate for doing that, along with waterproofing the building, was $58,428.

¶11. On direct examination, Dr. Giffin had this to say about the bulging brick wall:

Q. What about the brick at that time?

A. I noticed that there was a big bulging bulge in the brick wall on the east side. It looked like where the second brickers had picked up from the first brickers.

On cross-examination, Dr. Giffin gave this testimony:

Q. You are asking for . . . you are complaining of a bulge in the brick wall, is that correct?

A. Yes.

Q. Is that simply a result of the irregularities of the brick and the type of finish they used or is it truly a bulge?

A. It is truly a bulge.

Q. How many bricks are in it?

A. In what?

Q. In the bulge area?

A. It could possibly be the entire wall. I didn't have a straight edge long enough to check it all the way up the twenty feet.

¶12. Mr. Willie Earl Bennett laid part of the bricks for the Giffins' home. He gave the following account regarding the brick problem:

Q. Okay. Now is there . . . you and your crew finished the brick job over at the Giffin house, right?

A. Yes sir.

Q. Somebody else had already started it?

A. Yes sir.

Q. Was there a bulge at any time in any of the walls of the house?

A. Yes sir.

Q. And what had actually happened there, Mr. Bennett?

A. Okay, the way they was laying their bricks it looked like they was laying them, you know, they wasn't laying them flat, you know, they was leaning the brick over and you get a bigger mortar joint. Like you lean them forward, you know, set them down straight, you know you get a smaller mortar joint. And that's what happened, they were leaning the bricks over and they got a bigger mortar joint.

Q. Did you do anything to straighten that out?

A. I chiseled all that out.

Q. What did you do?

A. I chiseled all that out and re-laid it.

Q. How many bricks did you have to remove, if you remember, or how many rows?

A. I know it was about at least four or five rows, and it was about nine to about fifteen feet long.

Q. And once you got through you re-laid those bricks?

A. Yes sir.

Q. Was the problem cured then?

A. It was suppose to have been, everybody was satisfied.

Q. Did the Giffins look at it?

A. Yes sir.

Q. Did they express their satisfaction with it?

A. Yes sir.

¶13. None of the repair work was done, and at the time of trial, the house was not leaking as a result of the alleged faulty brick work. On this point, Dunaway gave this pertinent testimony:

Q. Are you aware that his house is not leaking at this point in time?

A. I am.

Q. So if it is not leaking why do you need to do this work?

A. Is that a rhetorical question?

Q. No, I expect an answer to it?

A. Okay, you need to do the work because the holes in the mortar actually form funnels for that water that runs down the face of the brick, is actually funneled into the building. Once that moisture is in the brick itself and the freeze/thaw deterioration takes over and the wear ability of the mortar as the disposable portion of the masonry wall is shortened considerably.

Q. And you don't know whether with this work whether that wall will last ten years, twenty years or thirty years, do you?

A. I cannot project that, no. I have an idea of what a standard projection should be.

Q. But you can't project what the wall life on this particular house would be, can you?

A. No, I can't. I can project that it is considerably lessened by the state of the mortar joints.

Q. But this work hasn't actually been done, has it?

A. Not the work of this proposal, no.

¶14. Leo Giurintano, co-owner of New Bellum, testified that there was no bulge per se, "the brick was just leaning in a little bit," and that was taken care of by removing and replacing five rows of brick. He further testified that to his knowledge no bulge remained after the repair.

¶15. It is not entirely clear to us from this record whether Dr. Giffin's entire testimony about the bulge related only to a bulge that remained after Bennett had completed the brick work for New Bellum or whether it also related to the bulge or leaning wall that admittedly existed prior to the corrective action by Bennett. However, based on the cross-examination of Bennett, it appears more likely that the complaint was about the condition of the wall after New Bellum had completed its work on the house. Therefore, we assume Dr. Giffin's complaint is about the existence of a bulge in the brick wall that he contends remained after Bennett had completed the brick work for New Bellum, and we will address this issue from that

perspective.

¶16. A thorough review of the testimony of Walker, Dunaway, Dr. Giffin, Bennett and Giurintano compels the conclusion that the trial judge erred in charging New Bellum $22,500 for faulty brick work. We note that Dr. Giffin's chief concern, as indicated by his testimony, was the bulging brick wall, not the faulty mortar joints. As noted, none of the recommended repair work was done. Dunaway admitted that, at the time of trial, the house was not suffering any leaks from the faulty brick work, and his only justification for sticking by his $58,428 repair proposal was that "once that moisture is in the brick itself and the freeze/thaw deterioration takes over and the wear ability of the mortar as the disposable portion of the masonry wall is shortened considerably." He could not project the longevity of the brick wall of the house with the defective mortar joints, although he was of the opinion that "it is considerably lessened by the state of the mortar joints."

¶17. It is undisputed that New Bellum substantially performed the contract, and since the Giffins opted not to repair the defective mortar joints or the bulge, their decision amounted to accepting a defective building, as they contended that those defects remained after New Bellum completed or substantially completed the contract. Of course, we are aware of New Bellum's position that no defects existed. It was the trial judge's prerogative to choose between the competing versions of the truth. Apparently, he accepted the Giffins', and there is sufficient evidence in this record to support his choice. His application of the law in the determination of the measure of damages, however, is quite another matter, and we are not required to give deference to his conclusion in this respect.

> Where a building is completed, substantially according to plans and specifications, the measure of damages may be determined by: (1) the cost rule which is the cost of repairing the defects to make the building or structure conform to the specifications where such may be done at a reasonable expense if unreasonable economic waste is not involved, or (2) the diminished value rule which is the difference in the value of property with the defective work and what the value would have been if there had been strict compliance with the contract. The diminished value rule applies where the defects cannot be remedied without great sacrifice of work or material or would impair the building, or would involve unreasonable economic waste, or where the defects cannot be repaired at a reasonable cost, or where it is not reasonable or practicable to remedy the defects, or where the cost of remedying the defects will not fully compensate the owner for damages suffered by him (citations omitted).

*Gerodetti v. Broadacres, Inc.*, 363 So. 2d 265, 268 (Miss. 1978).

¶18. It appears pretty obvious to us that grinding out all of the mortar joints on a completed building would involve a great sacrifice of work and be achieved at an unreasonable cost. That is borne out in this case by Dunaway's estimate which amounts to approximately one sixth of the entire construction cost of the house. Thus, we conclude that the Giffins' damages for the defective mortar joints and bulging wall should be calculated by utilizing the diminished value rule.

¶19. The trial judge did not indicate the basis for or the rule used in his computation of damages for these items; therefore, we do not know whether he utilized the cost rule or the diminished value rule. New Bellum contends that the damage award was established by speculation and conjecture. It cites the case of *Wright v. Stevens*, 445 So. 2d 791 (Miss. 1984), as authority for the proposition that damages must be based on something more than conjecture. That is a correct statement of the law.

¶20. The absence from the record of the rule of computation relied upon by the trial judge does not, however, preclude us from holding that the trial judge manifestly erred in making the damage assessment for the faulty brick work because as stated, given the fact that the Giffins did not make the repairs and accepted the house in the defective condition, the only proper rule to use was the diminished value. When the evidence is analyzed utilizing this rule to measure the Giffins' damages, it is quite clear that the trial judge's assessment could be based on nothing more than conjecture. Walker's testimony was that someday the wall containing the bulge might have to be replaced and that was why he gave the $12,000 figure. Dunaway's testimony was that he could not project the life of the defective wall(s) of the house. No evidence was offered as to the value of the house in its as-built condition and what it would have been had it been properly constructed in a workmanlike manner. The Giffins had the burden of proving their damages. On the issue of the faulty brick work, they failed to present sufficient evidence upon which a proper determination of damages could be made. Accordingly, we reverse and render the decision of the trial judge on this issue.

*Issue two: Deduction for replacement of french drains*

¶21. New Bellum claims that the original french drains installed by Michael Burchfield for New Bellum were severely damaged and rendered nonfunctional by Bob's Pool Service which was hired by the Giffins to build a swimming pool. New Bellum alleges that the french drains described in the Giffins' specifications were simple gravity-flow drains across the front of the house and beneath the house with discharge lines on either side of the house emptying into the Ross Barnett Reservoir, and that no diagrams, schematics, engineered blueprints, dimensions, or materials lists, depth and width of the trench, were provided by the Giffins.

¶22. Michael Burchfield, New Bellum's subcontractor who built the original french drains, testified that he installed two parallel french drains across the front of the house and one french drain along both sides and the back of the house during the first week of July 1995. He further testified that all drains were constructed as gravity-flow systems in accordance with the specifications and functioned very successfully to keep any water from entering the crawl space under the house. Don Walker, in his original inspection on or about November 1,1995, stated that there was standing water 4-6 inches deep under the house.

¶23. Bob's Pool Service did some walk work in August, September and October 1995. It is undisputed that Bob's Pool Service severely damaged the drains installed by Burchfield and even built walks over some portions of some of the drains. According to New Bellum, Bob's Pool Service "cut the hell out" of the drains, and New Bellum repaired them as best it could.

¶24. The Giffins also offered Paul Reed as an expert witness on the issue of the french drains. Reed, who operated a business under the name of Reed Foundation Company, installed the replacement french drains. The trial court did not allow Reed to testify as an expert, but did allow him to testify as a person engaged in that business with special training and skills.

¶25. Reed testified that the french drains installed by New Bellum did not work because they were not designed and constructed properly in that they were not deep enough and did not have the proper slope for drainage and needed pumps to work adequately. To correct this deficiency in construction, Reed testified that it was necessary to build a new system. The cost of the new system was $12,895. Reed testified that afterwards, the house remained dry underneath.

¶26. New Bellum contends that the drains it installed worked properly until damaged by Bob's Pool

Service which was hired by the Giffins to install a pool. New Bellum further contends that Bob's Pool Service also raised the soil level in the front and other areas around the house and that this affected the proper functioning of the drains. Therefore, New Bellum argues that it should not be held responsible for the installation of a new system. New Bellum also argues, without conceding liability for the cost of installing another system, that the replacement system installed by Reed for the Giffins exceeded the specifications and included wet wells and sump pumps. The obvious extension of this argument is that even if New Bellum is liable for a new system, it is not liable for the entire cost of the replacement system.

¶27. The evidence is in dispute on whether the drains, installed by New Bellum, ever worked properly and to what extent they were functionally damaged by Bob's Pool Service. By charging New Bellum with the full cost of replacing the drains, the trial judge obviously concluded the drains never worked properly. There is certainly evidence, though controverted, in the record to support a finding that the drains, installed by New Bellum, never functioned properly if what is meant by functioning properly is draining the water under the house so as to keep it dry underneath. Reed explained the problem with New Bellum's drains in this manner:

> The drain that was existing in there was too shallow and also maybe not quite enough adequate fall to clear the ditch out because, you know, the water, if it doesn't have a good fall, the water can build up several, three or four inches, in the drain before it actually clears out. You know, the elevation of the drain, that matters, because that raises the elevation of the bottom of the water table there when you don't have enough fall and if the drain had of had enough fall the crawl space would not have been flooded, period. Water doesn't run up hill it runs down hill.

Reed further testified that the drains he installed were a foot deeper in the front of the house and two to three feet deeper further down the line.

¶28. It appears quite obvious to us that if the shallowness and lack of fall to the drains, installed by New Bellum, were the reasons for those drains not functioning properly, and that Reed placed his drains at the proper depth with the proper fall, then there would have been no need for the additional installation of wet wells and sump pumps. Therefore, we cannot escape the conclusion that either the lack of depth and fall were not the sole problem with New Bellum's drains or the wet well and sump pumps installed by Reed were unnecessary. Yet, he testified that both were reasonable and necessary. His testimony on this point is uncontradicted. Thus, this evidence inevitably leads us to the further conclusion that if water was indeed underneath the house after installation of New Bellum's drains as Dr. Giffin testified, then it was not caused solely by the failure of New Bellum to install the drains at the proper depth and with the proper fall, even though New Bellum may have been guilty in this respect. Therefore, we reverse the trial judge's decision finding New Bellum liable for the replacement costs of the french drains and remand for a determination of whether, with the addition of wet wells and sump pumps, the drains installed by New Bellum would have drained the water from beneath the house. If the determination is that proper drainage would have been obtained, then New Bellum will not be liable for the replacement drains. On the other hand, if the determination is that even with the addition of the sump pumps and wet wells, the water would not have been drained, then New Bellum shall be liable for the replacement costs of the drains but not the wet wells and sump pump. We arrive at this disposition because as discussed below, we do not believe the evidence supports the trial judge's finding that under the contract New Bellum was required to install sump pumps or whatever else necessary to drain the water from beneath the house. We turn now to that sub-issue.

¶29. The trial judge recognized that the replacement system included wet wells and sump pumps, not designated in the plans and specifications, but reasoned that New Bellum should be liable for the entire cost because the plans and specifications required french drains to help drain the water off. The trial judge interpreted that to mean that New Bellum was obligated to install whatever was necessary to ensure the effectiveness of the french drains in removing all water from under the house. This is what the plans and specifications say on this point: "Fill work will consist of importing soil to low, water-holding level in middle of lot (from North to South) with topsoil or red sand-clay -- *enough imported soil should be brought in such that the surface dirt under the house is not wet* (french drains under house should be placed to help drain this water away)." (emphasis added).

¶30. In our view, there is a significant difference between contracting to import enough soil such that the surface dirt is not wet and *installation of french drains to help drain away the water*, and contracting to install french drains that will guarantee a dry surface under the house. There was no contention that New Bellum initially failed to import enough soil to guard against the wetness of the surface dirt under the house. There was some complaint about New Bellum's use of red sand as opposed to sand clay. The plans required that the fill material be either top soil or red sand-clay. The red sand was removed by New Bellum after suggestions to that affect and replaced with sand clay. The plans and specifications were prepared not by New Bellum but by the Giffins. Under these circumstances, we conclude the trial judge manifestly erred in interpreting the plans and specifications so broadly and liberally. Accordingly, we reverse and render that portion of the trial judge's decision finding New Bellum liable for the cost of the wet wells and sump pumps.

### Issue three: Deduction for a second story window

¶31. New Bellum does not argue that the window was installed by it; therefore, the Giffins are not entitled to a credit. Rather, New Bellum argues it was error for the trial court to allow this deduction because, on cross-examination, Keith Giffin testified he had made a mistake in submitting a claim for a $1,000 credit for a second story window that was not installed. While that is true, it is also true that on re-direct examination he clarified himself and asked the court to again consider the claim. We cannot find that the judge was manifestly in error or clearly wrong in allowing the claim. This issue is without merit.

### Issue four: Deduction for repairs to the kitchen/bedroom area

¶32. New Bellum argues that the leaking problem in the kitchen/bedroom area was caused by the location of a window directly on top of the gambrel roof. It contends that the Giffins, without New Bellum's knowledge, directed New Bellum's framer to locate the window in a position which caused some difficult problems in flashing the area. New Bellum also contends that the Giffins would not allow it to place a galvalum roof on the entire floor of the porch which would have solved the leaking problem if the leak were associated with the porch. Finally, New Bellum, citing *United States v. Spearin*, 248 U.S. 132 (1918) and *Havard v. Board of Supervisors of Humphreys County, for Use and Benefit of Louise Consol. School Dist.*, 220 Miss. 359, 70 So. 2d 875 (1954), argues that it should not be liable for the costs paid by the Giffins to M & S Roofing for repair of the roof which was causing the leak in the kitchen and bedroom areas because it simply did what the Giffins directed. It argues that it is protected by the following rule as pronounced in *Havard*:

> The general rule is that a construction contractor who has followed plans and specifications furnished by the owner, architect, or engineer, and which have been proved to be defective or insufficient, will not be responsible to the owner for loss or damages which result after the work has been completed,

solely from the defective plans and specifications, in the absence of any negligence on the part of the contractor or any express warranty by him as to the plans and specifications being free from defects.

*Id.* at 364, 70 So. 2d at 877.

¶33. The problem with New Bellum's reliance on *Spearin* and *Havard* is that in our case there is no proof that the plans and specifications were defective with respect to the provisions regarding the window and roof construction. By New Bellum's admission, the placement of the window in relationship to the roof posed some difficult problems in providing proper flashing for the area, but there is a vast difference in posing a difficult problem for a contractor and providing the contractor with defective plans. Accordingly, we find no error with the trial judge's decision to charge New Bellum with $2,088.64 as the cost of repairing the leaks.

*Issue five: Deduction for installation of a roof membrane*

¶34. New Bellum, relying upon *Spearin*, contends that it should not be liable for the cost of installing the roof membrane because (1) the plans and specifications did not require such an installation, (2) the leaking which occurred in the front wall resulted from door units with factory-installed defective thresholds and the failure of the blueprints to include a 6-8" step down from the door thresholds to the porch decking. Whether a membrane was required by the plans or not, New Bellum was required to construct the house in a workmanlike manner, meaning a house free of leaks. Even if the door units were defective when they came from the manufacturer, New Bellum would still be charged with the responsibility of constructing a leak free building for the Giffins. It would have to recoup from the manufacturer any damages it suffered because of the defective door units. As to New Bellum's claim that the leaking was also caused by the failure of the blueprints to include a 6-8" step, it is sufficient to say that the evidence does not support this contention. On this record, we cannot say the trial judge was clearly in error for charging New Bellum with the Giffins' cost for this repair. New Bellum's reliance on *Spearin* is misplaced because the evidence does not show that the areas was ever without a leak. Hence, it is difficult to see how it can be contended that the construction was done in a workmanlike manner. The judgment of the trial judge charging New Bellum with $3,153.29 for installation of the roof membrane is affirmed.

*Issues six, seven, eight, nine, twelve, and thirteen: Deductions for re-caulking the garage area, for repair to facia boards, for replacement of missing pier and beam, for repair of crack in bricks over the tripled-up rafters, for closing ceiling around chimney and for cleanup*

¶35. The trial judge charged New Bellum with the costs incurred by the Giffins in having the garage area re-caulked, ceiling closed around chimney, crack repaired in bricks over tripled-up rafters, and facia boards replaced. Additionally, the trial judge found that New Bellum should be charged for the costs of a pier beam that was not installed and for cleanup expenses. The aggregate cost was $4,717.22. We have considered New Bellum's arguments for why it should not be charged with these costs but are unpersuaded that the trial judge erred. We find that in each instance there was substantial, credible, and reasonable evidence to support the deductions on the basis that New Bellum had failed in its obligation to perform in a workmanlike manner. The record verifies that the trial judge went in depth into all evidence presented on these claims, and conducted a personal inspection of the home to observe the construction work firsthand. There is no evidence that he was either manifestly in error or clearly wrong in any of these instances. We find no merit to any of these assignments.

*Issue ten: Charge to New Bellum for interior damage as a result of missing pier*

¶36. All parties agreed that the plans and specifications for the house called for the inclusion of a pier which New Bellum failed to install on the home. At trial the Giffins sought to introduce evidence through the testimony of Keith Giffin regarding their estimate of the cost to repair interior damage to the house that the Giffins claim was caused by the missing pier. The trial court ruled as follows:

> BY THE COURT: Vernon, let me just say this; Now there is a difference in my mind between expenses that he has actually incurred after consulting with the consultants and the repair people. The repairs have been made. We've established the amount of it and his testimony that whatever deficiency was there is obviously corrected because the problem no longer exist. I've got no problem with that. Prospective repairs I do. Now he can testify about the beam missing, he can testify that there is a need for interior repairs, that there is a need for finishing the floors and baseboards, he can tell what he thinks is wrong with it and what needs to be fixed. He can't testify about the amount of it. Somebody else can come and do that. But he can't. But he can testify as to his own personal observations and that in his opinion this is a breach of the contract and needs repairing. That is as far as he will [sic] permitted to go on that.

¶37. There is no evidence in the record that anyone ever took the stand and testified as to any cost estimate to repair interior damage around the missing beam. Nevertheless, the court awarded the Giffins the sum of $3,000 for repair of interior damage around the missing pier. Likewise absent from the record is any explanation by the trial judge as to how he arrived at the $3,000 figure. Under the circumstances, it was manifestly erroneous for the trial judge to grant this award. His findings on this issue are reversed.

*Issue eleven: Charge to New Bellum to refinish floors and baseboards*

¶38. There was substantial conflicting testimony as to whether or not there was existing damage to the floors and baseboards of the home at the time of trial which was the result of leaks around the french doors. New Bellum claimed that the cupping of the wood floors in the den area and dining area of the house occurred as a result of the french doors in the den leaking due to the incorrect placement of the thresholds (applied backwards) at the manufacturing plant of Weather Shield Doors and Windows. Bowers Window and Door Co., the distributor who sold New Bellum Homes the door unit, contacted the Weather Shield representative and, according to New Bellum, the threshold problem was corrected. New Bellum claims that in December of 1995, Daniel Floor Finishing, a flooring contractor, at the request of New Bellum Homes, Bowers Window and Door Co., and the Giffins, completely re-sanded, re-stained, and refinished all affected floor areas pointed out to Daniels Floor Finishing by the Giffins. According to New Bellum, the work was completed to the total satisfaction of Keith Giffin, and Bowers paid Daniels $1,286.14 for the work. New Bellum claims that the check for payment was dated January 11, 1996, and no further word was ever heard from the Giffins regarding the floors.

¶39. New Bellum further claims that Keith Giffin's testimony at trial is proof that the trial court erred in making this award. The testimony was as follows:

> However, recently about a month ago, we had a busted water component that goes to our refrigerator and it poured water for twenty-four (24) hours. It flooded underneath our house and it also cupped more boards and damaged baseboards and walls. We had an insurance adjuster come in and I don't know exactly where it is on this, but we had an insurance adjuster come in and tell us

that...

¶40. It is New Bellum's contention that the $3,933.62 the court charged to New Bellum was the insurance carrier's estimate to repair the damage resulting from the broken copper line from the refrigerator to the wall valve connection more than one year after the house was occupied, and that if this damage did occur, liability for cost repairs belonged to the insurance company not New Bellum Homes.

¶41. The Giffins argue that nothing in the record indicates that Bill Daniels of Daniels Floor did any work on the floors of the Giffin house in December of 1995 when this condition existed. They contend that the testimony shows that the Giffins were not living in the house when he did his work. They admit that Bill Daniels did install and refinish the floors initially, but deny that he came back in December of 1995 to do the repair work. They cite Daniels's trial testimony that he did not know when he did the work, but that the Giffins were not living in the house at the time. The record shows that the Giffins began moving into the house on October 28,1995. The Giffins further cite Bill Daniels's trial testimony that there were going to be future problems with the floor, as proof that the work he did was on the initial installation of the floors, and not to repair the damage caused by the leaking from the french doors.

¶42. In their appeal brief, the Giffins claim that home inspector Don Walker testified that there was damage to the floors caused by leaking from the french doors and estimated the cost of repair as $4,000. Walker's trial testimony on this issue was as follows:

> Q. Did you address any cost dealing with the cupping of the wood floors?
>
> A. There again I was concerned about being fair and being objective. I saw cupping at the front wall of the house and at the rear wall of the house. Those floors were wet the day I looked at them for moisture. The house did not [have] electricity on, did not have heat. We did not have a controlled environment in that house. All the walls and floors were going to take on a new sizing and shaping, there was going to be contraction, there was going to be drying. All of that had to be concluded after the controlled environment, the humidity level had been reduced inside the house to know just how severe that cupping and buckling of those wood floors would be. *I put a range there of $4,000.00 dollars to replace them if that became necessary. But at that point, the day of the inspection, I couldn't determine that, that was a problem a controlled environment would yield.* (emphasis added)

¶43. There was no further testimony from Walker that he ever made a definite determination regarding the matter.

¶44. From an appellate point of view, we will not attempt to resolve the dispute as to whether the damage from the leaking around the french doors was or was not repaired by New Bellum. We find that there was insufficient proof of damage necessitating repair and of the estimated cost to repair it on which to base an award. Other than the fact that it is the exact amount requested by the Giffins, the record is silent as to how the $3,933.62 damage award was determined. We find that awarding damages under these circumstances was manifest error and the lower court's finding on this issue is reversed.

*Issue fourteen: Charges to New Bellum for cost of roof arbor*

¶45. New Bellum contends that this deduction was made so that the Giffins could install a roof over the arbor on the back of the house to prevent damage to the pine floors. New Bellum argues that the blueprints

did not provide for a roof over the arbor; therefore, New Bellum had no obligation to install one.

¶46. The trial judge's order provided for "repair" of the roof over the arbor. It did not mention the word "install" at all. Since there is not now nor has there ever been a roof over the arbor, it is unclear from the order just what deficiency this award was meant to compensate for. The Giffins claim that the evidence showed that repair work to the roof over the back of the house was necessary to prevent water damage. They also claim that the installation of a roof over the back porch area is necessary to prevent future water damage and that it is an expense that should be borne by New Bellum, even though it was not on the blueprints. They offer the testimony of Don Walker as proof of the necessity of a roof over the porch. Walker testified as follows:

> I figured with my experience with looking at houses with problems before, that the long range way to protect those doors, not to mention that was the only solution, was to install a cover over that back porch area, that was the $2,500 I recommended.

¶47. The Giffins are correct that Walker testified that a roof was needed over the porch; however, there is nothing in his testimony to indicate that the lack of a roof over the porch was the fault of New Bellum. Even if one could extrapolate liability for New Bellum from Walker's testimony, which we do not see how one logically could, his cost estimate was $2,500, not $5,405.64 as was awarded by the trial court. Once again, the trial court's opinion and order does not provide any explanation of how the monetary amount of the award was determined. We can find no support in the record for this award. The trial court was in manifest error on this issue and we reverse.

### Issue fifteen: Interest on construction loan

¶48. The lower court calculated that the completion date specified by the contract was July 13, 1995, and ordered New Bellum to pay interest on the Giffins' construction loan from that date forward to the time that the home was ready for occupancy, which was November 1, 1995. The interest amounted to $4,938.08. New Bellum concedes that construction was not completed within the two hundred days specified in the contract but argues that the contract provides for an extension of time due to adverse weather conditions and for this reason, the trial judge should have credited it with sixty-four extra working days which would have resulted in the contract being completed in a timely fashion.

¶49. We have examined the record and find that there was substantial, credible, and reasonable evidence to support the trial court's finding. It was not manifest error, nor was it clearly wrong for the trial court to hold New Bellum liable for interest paid on the loan from July 13, 1995 to November 1, 1995. This issue has no merit.

### Issue sixteen: Denial of New Bellum's claim for $10,527 for changes in depth of footings

¶50. New Bellum claims that the footings exceeded the depth called for in the specifications and soil report by an average of one and one-half feet. It contends that the changes were made at the direction of the Giffins' agent, David Dennis, and constituted verbal change orders totaling $10,527 over and above what was called for in the specifications. It alleges that the lower court erred in denying its claim for the added cost.

¶51. We have examined the record and find that there was substantial, credible, and reasonable evidence to support the denial of this claim. It was not manifest error, nor was it clearly wrong for the trial court to deny

this claim. This issue lacks merit.

### Issue seventeen: New Bellum's claim for $7,190 for additional site preparation

¶52. New Bellum claims that the Giffins and the engineer they hired to prepare the soil report intentionally withheld information regarding the severity of the water problem and saturated soil condition of the lot. New Bellum claims that it incurred unforseen expenses of $7,190 as a result of having to bring in twenty-nine truckloads of red sand just to accomplish the clearing of the lot along the east side. It alleges that none of the additional material and labor was included in the specifications or contract or plans and it should be compensated for all of these costs.

¶53. The Giffins contend that the specifications called for red sand clay and that New Bellum negligently used the wrong type of sand when it prepared the lot for excavation. They further charge that New Bellum did not perform with care, skill, and reasonable experience in this part of the construction process.

¶54. We have examined the record and find that there was substantial, credible, and reasonable evidence to support the denial of this claim. It was not manifest error, nor was it clearly wrong for the trial court to deny this claim by New Bellum. This issue has no merit.

### Issue eighteen: New Bellum's request for prejudgment interest

¶55. New Bellum contends it has met the criteria for awarding prejudgment interest set forth in *Preferred Risk Mutual Insurance Co. v. Johnson*, 730 So. 2d 574 (Miss. 1998) and should have been awarded prejudgment interest. We find that New Bellum failed to raise this issue with the lower court either at trial or in any post trial motion.

¶56. The law is well settled in Mississippi that appellate courts will not put trial courts in error for issues not first presented to the trial court for resolution, and that issues not presented in the trial court cannot be first argued on appeal. *Chassiniol v. Bank of Kilmichael,* 626 So. 2d 127, 133-34 (Miss. 1993). See also *Seaney v. Seaney,* 218 So. 2d 5 (Miss. 1969), *A. H. George And Co. v. Louisville & N. R. Co.*, 88 Miss. 306, 40 So. 486 (1906). This issue is without merit.

### CONCLUSION

¶57. We affirm the judgment of the trial court as to issues three, four, five, six, seven, eight, nine, twelve, thirteen, fifteen, sixteen, seventeen, and eighteen. We reverse and render the judgment of the trial court as to issues one, ten, eleven, and fourteen. We reverse and remand the judgment of the trial court as to issue two. In summary, the judgment of the trial court in favor of New Bellum in the amount of $16,039.17 is reversed, and judgment is granted here in favor of New Bellum in the amount of $50,878.43.

¶58. **THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY AWARDING JUDGMENT AGAINST THE APPELLEES IN THE AMOUNT OF $16,039.17 IS REVERSED AND RENDERED IN THE AMOUNT OF $50,878.43. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY CHARGING APPELLANT $12,338.96 FOR THE COST OF REPLACEMENT FRENCH DRAINS IS REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY IS AFFIRMED AS TO ALL OTHER ISSUES. COSTS OF THIS APPEAL ARE ASSESSED ONE HALF TO THE APPELLANT AND ONE**

**HALF TO THE APPELLEES**.

**KING, P. J., LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR. McMILLIN, C. J., SOUTHWICK, P. J., AND BRIDGES NOT PARTICIPATING**.